

# The Attorney General of Texas

December 31, 1982

MARK WHITE
Attorney General

Supreme Court Building
P. O. Box 12548
Austin, TX. 78711- 2548
512/475-2501
Telex 910/874-1367
Telecopier 512/475-0266

1607 Main St., Suite 1400
Dallas, TX. 75201-4709
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905-2793
915/533-3484

Dallas Ave., Suite 202
H.~ston, TX. 77002-6986
713/650-0666

806 Broadway, Suite 312
Lubbock, TX. 79401-3479
806/747-5238

4309 N. Tenth, Suite B
McAllen, TX. 78501-1685
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205-2797
512/225-4191

An Equal Opportunity/
Affirmative Action Employer

Honorable Oscar H. Mauzy, Chairman
Committee on Jurisprudence
Texas State Senate
State Capitol Building
Austin, Texas    78711

Opinion No. MW-563

Re:   Validity of ordinances
enacted by Kirby, a general
law city

Dear Senator Mauzy:

In 1979, the city of Kirby, which is a general law city, enacted an ordinance entitled:

> An ordinance regulating the keeping of animals
> including but not limited to, livestock, fowl,
> dogs and cats within the city limits of the city
> of Kirby; prescribing sanitary conditions for pens
> and enclosures; providing exceptions; providing a
> penalty not to exceed two hundred dollars
> ($200.00); and repealing all ordinances or parts
> of ordinances in conflict herewith.

You have asked whether this ordinance conflicts with section 251.001 et seq. of the Agriculture Code. Acts 1981, 67th Leg., ch. 693, at 2595, incorporating Acts 1981, 67th Leg., ch. 124, at 313 (codified as article 165b-1, V.T.C.S.). You have also inquired about the legality of certain actions taken by the mayor and city council of Kirby.

Section 251.002 of the Agriculture Code provides:

> In this chapter:
>
> (1)  'Agricultural operation' includes but is
> not limited to the following activities:...
> raising or keeping livestock or poultry....
>
> (2)  'Governmental requirement' includes any...
> ordinance... promulgated by a... city... that has
> the power to enact or promulgate [it].

Section 251.004 of the code provides:

> (a)  No nuisance action may be brought against
> an agricultural operation that has lawfully been

in operation for one year or more prior to the date on which the action is brought, if the conditions or circumstances complained of as constituting the basis for the nuisance action have existed substantially unchanged since the established date of operation. This subsection does not restrict or impede the authority of this state to protect the public health, safety, and welfare or the authority of a municipality to enforce state law.

(b) A person who brings a nuisance action for damages or injunctive relief against an agricultural operation that has existed for one year or more prior to the date that the action is instituted or who violates the provisions of Subsection (a) of this section is liable to the agricultural operator for all costs and expenses incurred in defense of the action, including but not limited to attorney's fees, court costs, travel, and other related incidental expenses incurred in the defense.

(c) This section does not affect or defeat the right of any person to recover for injuries or damages sustained because of an agricultural operation or portion of an agricultural operation that is conducted in violation of a federal, state, or local statute or governmental requirement that applies to the agricultural operation or portion of an agricultural operation.

The fundamental question is whether section 251.004 limits the power of a municipality to enforce an ordinance that declares certain activities to be "nuisances." For the following reasons, we answer in the negative. We therefore conclude that the city of Kirby may enforce its livestock ordinance without violating section 251.004.

The key words in section 251.004 are "nuisance action." If a particular legal proceeding does not constitute a "nuisance action" within the meaning of this section, the section is not triggered. Our task, therefore, is to determine what the term "nuisance action" embraces.

Professor Prosser has observed that "[t]here is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.'" W. Prosser, Handbook of the Law of Torts 571 (4th ed. 1971). The term is difficult to define. Stoughton v. City of Fort Worth, 277 S.W.2d 150, 152-53 (Tex. Civ. App. – Fort Worth 1955, no writ), offers this overview of "nuisance" law:

> In a broad sense, a nuisance is anything that works injury, harm or prejudice to an individual or the public.... A nuisance has also been defined as anything that 'obstructs, impairs or destroys the reasonable, peaceful, and comfortable use of property....' 'A nuisance per se is generally defined as an act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings....' 'Acts which are, denounced as illegal by law, when the perpetration of them invade the rights of others will be nuisances per se....' A public nuisance exists wherever acts or conditions are subversive of public order, or constitute an obstruction of. public rights. (Citations omitted).

Nuisances are classified as "private" or "public." A "private" nuisance is a civil wrong, based on a disturbance of one's right to use or enjoy land. The remedy for it lies in the hands of the individual whose rights have been disturbed. He may, for example, seek either injunctive relief, see, e.g., O'Daniel v. Libal, 196 S.W.2d 211 (Tex. Civ. App. - Waco 1946, no writ), or damages, see, e.g., Vestal v. Gulf Oil Corporation, 235 S.W.2d 440 (Tex. 1951). A "public" nuisance, on the other hand, involves some substantial interference with the rights of the community at large, such as with the public health, peace or comfort. Usually public nuisances are designated as such by a statute or ordinance. Where this is the case, the governmental entity which enacted the law will be responsible for enforcing it. See generally Storey v. Central Hide and Rendering Company, 226 S.W.2d 615 (Tex. 1950); McKee v. City of Mt. Pleasant, 328 S.W.2d 224 (Tex. Civ. App. - Texarkana 1959, no writ); Stoughton v. City of Fort Worth, supra; W. Prosser, supra, at 572-602.

We conclude that the legislature's intent in enacting section 251.004 was simply to limit the circumstances under which suits may be brought against "agricultural operations" that are not being conducted in violation of any law. In other words, where a legal proceeding alleges that an "agricultural operation" constitutes a "nuisance," but the operation is not being conducted in violation of any statute or ordinance, such a proceeding would constitute a "nuisance action" within the meaning of section 251.004. Proceedings for damages or injunctive relief initiated by private individuals would fit in this category. On the other hand, where a proceeding is initiated to enforce a statute or ordinance, it would not constitute a "nuisance action" under section 251.004.

The language of section 251.004 supports this conclusion. See State v. Terrell, 588 S.W.2d 784 (Tex. 1979) (legislative intent to be ascertained from statutory language). In particular, two provisions

in this section make it clear that the legislature did not intend this section to have any effect upon proceedings brought to enforce a statute or ordinance. The first is the sentence in subsection (a) which states that the subsection "does not restrict or impede the authority of this state to protect the public health, safety, and welfare or the authority of a municipality to enforce state law." The second is the statement in subsection (c) that "[t]his section does not affect... the right of any person to recover for injuries or damages sustained because of an agricultural operation... conducted in violation of a federal, state, or local statute...."

Additional support for our conclusion can be found by examining section 251.005 of the code. See Merchants Fast Motor Lines, Inc. v. Railroad Commission of Texas, 573 S.W. 2d 502 (Tex. 1978) (legislative intent to be determined by looking at entire act, not just isolated portions thereof). It provides in part:

> (a) For purposes of this section, the effective date of a governmental requirement is the date on which the requirement requires or attempts to require compliance as to the geographic area encompassed by the agricultural operation. The recodification of a municipal ordinance does not change the original effective date to the extent of the original requirements.
>
> . . . .
>
> (c) A governmental requirement of a city does not apply to any agricultural operation situated outside the corporate boundaries of the city on the effective date of this chapter. If an agricultural operation so situated is subsequently annexed or otherwise brought within the corporate boundaries of the city, the governmental requirements of the city do not apply to the agricultural operation unless the requirement is reasonably necessary to protect persons who reside in the immediate vicinity or persons on public property in the immediate vicinity of the agricultural operation from the danger of explosion, flooding, vermin, insects, physical injury, contagious disease, removal of lateral or subjacent support, contamination of water supplies, radiation, storage of toxic materials, discharge of firearms, or traffic hazards.

When sections 251.004 and 251.005 are considered in pari materia, it becomes clear that the legislature has limited both the power to initiate "nuisance actions" which do not seek enforcement of a law or

ordinance <u>and</u> the enforceability of laws and ordinances themselves. It has done so, however, in two distinct statutes.

Section 251.005 limits the territorial effect of, among other things, city ordinances. It does not impair the enforceability of ordinances <u>within</u> the geographical areas in which the ordinances apply under its terms. In our opinion, if the legislature had meant for section 251.004 to have any effect upon the power of a municipality to enforce its ordinances even in the areas in which they apply, it would have given some affirmative indication in section 251.005 that such ordinances may be given only limited effect in those areas. The fact that, in section 251.005, the legislature limited the territorial effect of city ordinances but said nothing about limiting their enforceability <u>within</u> the areas in which they apply is strong evidence that section 251.004 should not be read as imposing any such limitations.

For these reasons, we conclude that a legal proceeding that is initiated to enforce a law or ordinance that classifies an activity as a "nuisance" does not constitute a "nuisance action" within the meaning of section 251.004. Section 251.004, therefore, does not impair the city of Kirby's right to enforce its livestock ordinance.

You next ask whether the following resolution of the Kirby City Council violates the Open Records Act, article 6252-17a, V.T.C.S.:

> Be it resolved, that to encourage an unhindered flow of communication and the discussion and deliberation of city business matters that by general or special statute cannot be made public or which might adversely affect the public security, financial interest of the city of Kirby, Texas, or the reputation of any person, and to insure the protection of the attorney-client privilege recognized by law, the mayor, all city council members and the city attorney, or anyone who may be present during an executive session, shall be prohibited from making the contents of any executive session known to the public....

To the extent that this resolution prohibits the named individuals from <u>orally</u> "making the contents of any executive session known to the public," its enforceability is not dependent upon the Open Records Act. In our opinion, that act, which applies to information in the possession of a governmental body, has no bearing upon what members of that body may choose to say in public. In enforcing this resolution, the city might encounter difficulties, such as the first amendment to the federal Constitution, but the Open Records Act would not be among them.

To the extent that the resolution applies to such things as documents discussed in an executive session or a council member's notes of that session, however, a different question is presented. Until the city receives a formal request for particular information, its right to enforce this resolution would not depend upon the Open Records Act, because the act does not come into play until such request is received. Once a request is received, however, the resolution could have no effect upon the decision of the custodian of information of the governmental body as to whether access to the requested material must be granted. If the custodian is asked to release a document involved in the executive session, in other words, he will have to determine whether the Open Records Act requires its release. This resolution cannot shield from public view any information in the governmental body's possession that must be made public under the terms of the Open Records Act.

You next ask whether the city council may direct the city attorney "to report directly to the city council regarding all city business." We have insufficient facts with which to answer this question. In general, since the city attorney is employed by the city of Kirby, we see no reason why the city council cannot direct him to report to it regarding city business. On the other hand, the resolution in question also contains a flat prohibition against written or verbal communications between the city attorney and various city officers. In enforcing this prohibition, the city could encounter problems under the first amendment, particularly if it takes punitive measures against the city attorney for violating it.

You next ask whether three city council members may prepare a resolution without the knowledge of the mayor, city staff, or the other two council members and then present and pass it at a council meeting. Since you have not indicated the legal problem that you think the above action raises, we will assume that your question is whether the affirmative vote of three council members is sufficient to pass a resolution. You do not present any facts suggesting any violation of the Open Meetings Act. V.T.C.S. art. 6252-17.

Article 997, V.T.C.S., provides:

> All ordinances and resolutions adopted by the council shall, before they take effect, be placed in the office of the city secretary; and the mayor shall sign those he approves. Such as he shall not sign, he shall return to the city council with his objections thereto. Upon the return of any ordinance or resolution by the mayor, the vote by which the same was passed shall be reconsidered. If, after such reconsideration, a majority of the whole number of aldermen agree to pass the same, and enter their votes on the journal of their

> proceedings, it shall be in force.  If the mayor
> shall neglect to approve or object to any such
> proceedings for a longer period than three days
> after the same shall be placed in the secretary's
> office as aforesaid, the same shall go into
> effect.

City of Centerville v. Adkisson, 291 S.W.2d 798 (Tex. Civ. App. -
Waco 1956, no writ), held that a mayor was not an "alderman" within
the meaning of article 1033, V.T.C.S., which required the "consent of
two-thirds of the aldermen elected."  Likewise, we believe a mayor is
not an "alderman" within the meaning of article 997.  Since this is
true, even if the mayor refused to approve a particular resolution, "a
majority of the whole number of aldermen" could override his veto.
Three of the five "aldermen" constitute a majority.  Thus, under
article 997, three city council members may pass a resolution.  Of
course, it is up to the council to determine whether the manner in
which a resolution is brought before it comports with local
requirements, rules of parliamentary procedure, etc.  See generally 40
Tex. Jur. 2d Municipal Corporations §§262, 268.

You next ask whether the mayor has the authority to send a
"letter of reprimand" to a city council member.  The first amendment
protects the individual's right to self expression.  This particular
letter, moreover, does not threaten the council member with any
particular sanctions.  Thus, we have no occasion to consider whether
the mayor would be authorized to do more than merely "reprimand" the
council member, i.e., take some sort of concrete punitive action
against him.

You finally ask whether the mayor has the authority to establish
city policy.  Article 996, V.T.C.S., provides:

> The mayor shall have power to administer oaths
> of office.  He shall have authority in case of a
> riot or any unlawful assemblage, or with a view to
> preserve peace and good order in said city, to
> order and enforce the closing of any theatre....
> He shall perform such other duties and possess and
> exercise such other power and authority as may be
> prescribed and conferred by the city council.
> (Emphasis added).

A mayor derives his powers and duties from statutes, the city
charter, valid ordinances, and resolutions of the city council.  See
Nixon v. City of Houston, 560 S.W.2d 447 (Tex. Civ. App. - Houston
[14th Dist.] 1977, writ ref'd n.r.e.); City of Galveston v. Hutches,
76 S.W. 214 (Tex. Civ. App. - 1903), rev'd on other grounds sub nom.
Abbott v. City of Galveston, 79 S.W. 1064 (Tex. 1904).  After listing
specific powers, article 996 provides that the mayor shall possess

"such other power... as may be prescribed and conferred by the city council." Thus, in any particular instance, the mayor's right to establish policy unilaterally will depend upon whether he has been given such power by law or by the city council.

### S U M M A R Y

1.  The city of Kirby may enforce its livestock ordinance without regard to section 251.001 et seq. of the Agriculture Code.

2.  The Open Records Act, article 6252-17a, V.T.C.S., has no bearing on the enforceability of a city resolution forbidding participants in an executive session of the city council from divulging the contents of said session to the public until the city receives a formal request for information at issue in said session.

3.  The city council may direct the city attorney to report directly to the council regarding all city business. Whether its prohibition against discussions with named individuals is enforceable under the first amendment to the federal Constitution would depend upon the facts of the case.

4.  The vote of three council members is effective to pass a resolution.

5.  There is nothing to prohibit a mayor from sending a letter of "reprimand" to a city council member.

6.  If authorized by statute or by the city council, the mayor may establish local policy unilaterally.

Very truly yours,

MARK   WHITE
Attorney General of Texas

JOHN W. FAINTER, JR.
First Assistant Attorney General

RICHARD E. GRAY III
Executive Assistant Attorney General

Prepared by Jon Bible
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Susan L. Garrison, Chairman
Jon Bible
Rick Gilpin
Patricia Hinojosa
Jim Moellinger
Stan Reid